**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

_____

**CONFLICT KINETICS, INC** )
 )
 )
      Plaintiff, )
 )
v. )
 )
**DANIEL GOLDFUS and** )  Civil Action No. 1:22-cv-00315
**BAGIRA SYSTEMS, LTD.,** )
**BAGIRA SYSTEMS USA, LLC** )
**And the MINISTRY OF DEFENSE** )
**(ISRAEL)** )
      Defendants. )
 )
_____ )

**SECOND AMENDED COMPLAINT**

     Plaintiff, Conflict Kinetics, Inc., ("CK"), by counsel and for its Second Amended

Complaint against the Defendants states as follows:

**NATURE OF CASE**

     1.     This case arises out of Defendants', Daniel Goldfus, the Ministry of Defense

(Israel), Bagira Systems, Ltd.,  and Bagira Systems USA, LLC, conspiracy, led by Defendant

Goldfus without authorization and in excess of authorization, to misappropriate trade secrets of

Plaintiff with intent to injure Plaintiff's business; to interfere intentionally and maliciously with a

Plaintiff contract and business expectancy, and to willfully and continuously breach Defendant

Goldfus' fiduciary duties, for the gain and unjust enrichment of all defendants.

     2.     Defendants' tortious conduct includes violation of the Virginia Uniform Trade

Secrets Act, Va. Code § 59.1-336 *et seq.,* statutory business conspiracy, Va. Code §§ 18.2-499

and 18.2-500; common law conspiracy; tortious interference with a contract; breach of a

1

fiduciary duty; unjust enrichment; and collecting business intelligence for unjust personal and professional gain under the auspices of US/Israeli partnership treaties.

**PARTIES**

3.      Conflict Kinetics is a Virginia corporation with a principal place of business at 22977 Eaglewood Court, Suite 160, Sterling, Virginia 20166.

4.      Conflict Kinetics is an award-winning, privately-owned business that has provided highly specialized advanced Lethality and Survivability Training Technologies (LSTT) in human performance optimization for our nation's warfighters and has provided unique research and development, test and evaluation services for universities, federal, state, and local governments, and international governments entities for over 13 years.

5.      Defendant Daniel Goldfus ("Goldfus") is an individual who lives and works in Israel and was at the time of filing of the original  complaint living and working in the United States.

6.      Goldfus has been employed by the Israeli Ministry of Defense ("MOD") from roughly 1995 through 2021.  During the time period of the allegations in this Complaint, Goldfus was acting within the scope of his employment with, and for the benefit of, the Ministry of Defense. Goldfus is an employee and agent of the MOD acting in a commercial role.

7.      In the alternative, during the time period of the allegations in this Complaint, Goldfus was acting as a private citizen outside the scope of his employment with the MOD.

8.      The Ministry of Defense is an Israeli government agency responsible for defending, protecting, and securing Israel and its civilians through political, military, and social means with its headquarters located in Israel.

9.      Defendant Bagira Systems, LTD ("Bagira") is an Israeli entity registered to do business in the United States, with a principal place of business at 26 Hakishur, HOLON, 005886708 ISRAEL.

10.     At all times pertinent to this complaint, Defendant Bagira Systems USA, LLC was either registered to do business in the state of Delaware or existed under an expired registration while still being held out by Bagira Systems, LTD as an extension of that entity.

11. Through at least July of 2022, Bagira Systems, LTD and Bagira USA were entities under the Armaz Group umbrella.

12. Bagira USA, LLC was registered as a foreign owned company in Florida from February 2015 through May 2017 with a principal address of 2953 Burning Tree Court, Oviedo, FL 32765.

13.  From 2017 through 2022, Bagira USA was identified on the Armaz website as being located at 2953 Burning Tree Ct, Oviedo, Florida, a period that extended well beyond the 2017 expiration of Bagira USA's registration with the State of Florida.

14. From as early as September 2015, the Bagira Systems Ltd. website identified Bagira USA as a part of the  company but did not identify the legal status of Bagira USA nor the legal relationship between Bagira, USA and Bagira Systems, Ltd.

15.  Prior to 2018, the Bagira website provided the Oviedo, Florida address for contact with Bagira USA.

16.  In 2018 and 2019, the Bagira website identified 44001 Indian Fields Ct., Lansdowne, VA as the contact address for Bagira USA.

17.  At all times, the Bagira Systems website identified the contact email for Bagira USA as info@bagirasys.com, the same email address identified for Bagira Systems, Ltd.

18. Yaron Mizrachi is the principal of both Defendant Bagira Systems, LTD and Defendant Bagira Systems USA, LLC.

19. An Affidavit prepared by Mr. Mizrachi, the CEO of Bagira Systems, Ltd. in July 2022 asserted that "Bagira Systems, USA LLC was formed on October 6, 2014 under Delaware law. . .. Bagira USA is not a subsidiary of Bagira Israel but is an affiliate of Bagira Israel.  Bagira USA is not registered in any other state.  However, Bagira USA is not an active company and has not been active for a number of years." Dkt. 15 P2/6 1:22-cv-00315-MSN-JFA

20.  Despite this assertion by Mr. Mizrachi in July of 2022, as of July 23, 2022, Bagira USA was still featured on the Armaz Group website and described as providing "Marketing and support for the introduction and maintenance of Bagira's training solutions in the North American markets."

http://web.archive.org/web/20220723203859/https://www.armaz.co.il/index.php?option=com_k2&view=item&layout=item&id=57&Itemid=152

21.  According to the Delaware Secretary of State, Bagira USA was registered in 2014 and noted inactive as of November 14, 2022, several months *after* Mr. Mizrachi's July 2022 statement under oath.

22.  Bagira USA was registered as a foreign business in Florida in 2014 and 2015.

23.  Upon information and belief, Bagira USA was never registered to do business in Virginia.

24.  Given the lack of registration within the US and Mr. Mizrachi's assertion, it is reasonable that Bagira USA was operating as an alter-ego to Bagira Systems Ltd as it was not its own legal entity.

25. The court can take judicial notice that Bagira Systems USA, LLC identifies its website as www.Bagirasys.com in its mandatory reporting to the US government through SAM.gov. This is the same website Bagira Systems, Ltd. Utilized for their SAM.gov listing.

26. Bagira Systems, LTD and Bagira Systems USA, LLC are collectively referred to as "Bagira" or "Bagira Systems".

27. According to its website, Bagira "designs, develops, and operates simulators and training systems, with the goal to enhance Mission Readiness**."** Bagira is a direct competitor of CK.

## **JURISDICTION AND VENUE**

28. This Court has subject matter jurisdiction pursuant to 28 U.S C. § 1331 because this case arises under 28 U.S.C. § 1332(a) as there exists complete diversity of citizenship between the Plaintiff and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.  This Court has supplemental subject matter jurisdiction over the state law and common law claims pursuant to 28 U. S. C. § 1367(a).

29. This court may exercise personal jurisdiction of Goldfus because he was physically present in the jurisdiction at the time he secured confidential and proprietary information from Plaintiff Conflict Kinetics and has committed the alleged torts in the Commonwealth of Virginia as alleged *infra*.

30. This court may exercise personal jurisdiction over Bagira because it is registered to conduct business in the United States and maintained a business location in Virginia.

31. This court may exercise personal jurisdiction over MOD because Defendant Goldfus was an employee of MOD and was acting in the course of his employment during his interactions with Plaintiff including Goldfus' visit to the Conflict Kinetics headquarters in

Sterling, Virginia.

32. Further, Virginia's long-arm statute grants the court authority to exercise personal jurisdiction over nonresidents, such as Bagira and the MOD, who directly, or through an agent, transact any business within the Commonwealth, so long as the cause of action arises from the non-resident's transaction of business. Va. Code § 8.01–328.1(A)(1).

33. Virginia's long-arm statute also grants the court authority to exercise personal jurisdiction over nonresidents who cause tortious injury by act or omission in Virginia.  Va. Code § 8.01–328.1(A)(3).

34. Jurisdiction is also supported by the Virginia Supreme Court holding stating that a court may exercise specific personal jurisdiction over a nonresident defendant acting outside of the forum when the defendant has intentionally directed his tortious conduct toward the forum state, knowing that that conduct would cause harm to a forum resident. *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

35. Jurisdiction over Bagira and the MOD is also consistent with *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013) where the Court may impute constitutionally sufficient contact with Virginia through the actions of the alleged co-conspirator, where Plaintiff can make a plausible claim (1) that a conspiracy existed; (2) that the …defendants participated in the conspiracy; and (3) that a co-conspirator's activities in furtherance of the conspiracy had sufficient contacts with Virginia to subject that conspirator to jurisdiction in Virginia.

36. Venue is proper in this District pursuant to 28 U. S. C. § 1391 because each Defendant is subject to personal jurisdiction in this District as Goldfus secured the intellectual property through a six hour demonstration which detailed the depths of CK's technology and described specific trade secrets, including those trade secrets specifically requested by Defendant

6

Goldfus at the CK headquarters in Virginia and thereafter inappropriately shared, and guided Bagira's commercial developmental and production activity with that information gathered in Virginia, in furtherance of Goldfus', the MOD's and Bagira's interests contrary to those of Conflict Kinetics.

37. Bagira Systems USA, LLC previously maintained a place of business in this District and as recently as January 2022 has attended tradeshows promoting their goods.

### FACTS

### A.  CONFLICT KINETICS' PROTECTION OF INTELLECTUAL PROPERTY

38. At all times relevant to this Complaint, CK took, and continues to take, reasonable steps to maintain the secrecy of its trade secrets including restricting access to the information to employees and agents of CK who need access to perform their functions and services for CK and to those parties, both in the U.S. and abroad, who have agreed to hold such information in confidence.

39. Restrictions on access include, but are not limited to, using a password and dual authentication systems to access information stored on CK computer systems, and requiring individuals to execute confidentiality and non-disclosure agreements before viewing any CK proprietary Lethality and Survivability Technology.  CK also intentionally avoids all trade shows or commercial events where the methodologies would be visible to third parties or the general public.

40. Conflict Kinetics' trade secret information is not generally known or readily accessible by unauthorized individuals using proper means and this information would be of substantial economic value to CK's competitors if it became known to them.

41. The economic value from secrecy is derived by CK retaining exclusive knowledge of

its training techniques, integration of hardware systems, and the scientific application of its training techniques to specific customer needs. With access to CK's proprietary trade secrets, a competitor could copy or reverse-engineer CK's products and sell them in competition with CK, as happened in this matter. Prior to discussion of or access to any physical aspects of CK's confidential/proprietary property, each individual or entity is required to execute a non-disclosure/confidentiality agreement.

42. CK introduces potential business partners to its product through a power point presentation that is clearly marked proprietary/confidential information.  Further, once a Gun Fighter Gym is installed at a particular facility, access to the Gym is closely guarded.

## B.  CONFLICT KINETICS' INTELLECTUAL PROPERTY

43.  CK's unique Gunfighter Gym and its methods and processes have been sought after by its customers since the company's organization in 2008.

44.  Conflict Kinetics' (CK's) Gunfighter Gym is the only small arms synthetic training system currently possessing a US Department of Defense (DoD) certified Operational Test and Evaluation Independent Agency Research and training effects validation study. This DoD study demonstrated CK's delivery of weapons skills and shooter lethality exceeding all other simulation systems on the market, as well as live-fire training. CK's graduates are faster and more lethal because CK's trade-secret-protected technology delivers superior synthetic small arms training. CK's technology ensures an increase in warrior performance and lethality. Thus, enhanced decision-making skills, decreased lost training time, and reduced costs while training Soldiers, Special Operation Forces (SOF), and Force-enablers in a multinational environment, including maintaining the highest proficiency and relevancy in marksmanship and combat gunfighting.

45. CK has been granted 5 U.S. Patents in "Methods and Processes" of LSTT's elevated human performance in small arms simulation and has several Patents Pending.

46. Conflict Kinetics intellectual property that is not appropriate to be patented is protected by CK as trade secrets.

47. Conflict Kinetics derives independent economic value from its trade secrets, which include but is not limited to, simulated training process, procedure and methodology, pricing information, and non-obvious, novel designs, patterns, and appearance that CK developed over time and at great expense.

48. CK is currently delivering on six (6) U.S. DoD, Israeli Sole and Foreign FMF Source contracts for these advanced Lethality and Survivability simulation Gunfighter Gym "Methods and Process" technologies in over 12 countries.

### C.  CONFLICT KINETICS' RELATIONSHIP WITH ISRAELI MINISTRY OF DEFENSE (MOD)

49. As part of U.S. collaboration with Israel, on or about June 13, 2016, CK met with members of the Israeli Naval Special Forces and the Israeli Defense Forces (IDF) along with members of an advanced U.S. Special Forces unit on a U.S. military base at Coronado Island, California to demonstrate CK lethality and survivability technologies and human centric training simulation center and methodology.

50.This demonstration was the foundation of a bridge between U.S. advanced special operator Cognitive Dominance training and Israeli Navy Special Forces desire to cross-unit train with U.S. forces while diving deeper into the measurement and evolution of their Cognitive Dominance programs.

51. CK's Gunfighter Gym and its methods and processes were sought after by Israel for its long reputation, data, validated, verified, and certified peer performance at this advanced unit

headquarters since 2012.

52. At the time of the initiation of discussions with the MOD, a Non-Disclosure/Confidentiality agreement was signed on behalf of the MOD advising that all information imparted by Conflict Kinetics in their discussions, demonstrations and communications was considered CK proprietary, confidential and trade secret.

53. This initial meeting eventually culminated in a November 29, 2019 contract for Conflict Kinetics to provide training and simulation services in Israel.

54. As part of the deliverable on this contract, Conflict Kinetics constructed the first Gunfighter Gym in Israel in January 2020.

## D.  GOLDFUS EMPLOYMENT WITH ISRAELI DEFENSE FORCES AND ACCESS TO CONFIDENTIAL AND PROPRIETARY INFORMATION.

55. Goldfus has been employed by the Israeli Defense Forces (IDF), under the  Ministry of Defense, in various roles since about 1995, including his position which made him responsible for identifying expert military training services to be contracted by the IDF from 2019 through 2021.

56. In or about mid-2019, Goldfus, purportedly in his capacity as an employee and agent of the MOD, reached out to Conflict Kinetics to arrange a visit to Conflict Kinetics headquarters in Sterling, Virginia.  The purpose of the visit was to learn about, and see a demonstration of, the capabilities of the Gunfighter Gym.  The purported purpose of the visit was the possibility of a Foreign Military Financed (FMF) contract with Conflict Kinetics to provide the Gunfighter Gym to the IDF.

57. Upon information and belief, Goldfus had become aware of the existence of the Gunfighter Gym through the November 2019 contract with the MOD/PMO and the ongoing efforts of an S13 FMF case to secure a contract on their own behalf with CK. Goldfus wanted to

explore the possibility of a contract on behalf of the IDF.

58. The November 2019 contract did not authorize Goldfus to have access to any CK trade secrets, or for the IDF, or the MOD  generally, to disclose CK trade secrets.

59. Goldfus presented to the Conflict Kinetics headquarters in Sterling, Virginia on September 25, 2019 where he met with representatives of Conflict Kinetics. Goldfus reached out to CK employees in Virginia to set up this meeting.

60.This six-plus hour visit was dedicated to a discussion and hands-on tactical demonstration of the lethality capabilities of the Gunfighter Gym and how that technology could assist with the training of the members of the IDF, outside of the PMO contract.

61. During the course of this visit, Conflict Kinetics utilized a power point presentation that discussed the various elements of the Gunfighter Gym.  This presentation was clearly marked as "confidential and proprietary" information.

62. At the conclusion of the visit, Goldfus expressed significant enthusiasm for the technology and assured Conflict Kinetics that he would start the FMF process to push through a contract for the IDF under his cognizance and outside of the PMO contract.

63. Subsequent to this initial visit to Conflict Kinetics,  Goldfus was continuously promoting Conflicts Kinetics within the  Ministry of Defense (MOD), stating he wanted CK to provide the highly specialized lethality and survivability simulation training services to the IDF.

64. In furtherance of his stated intent, Goldfus consistently and persistently requested additional confidential and proprietary trade secret information from Conflict Kinetics under the auspices of being part of a near-term U.S. Department Foreign Military Financing (FMF) procurement for the Israeli Defense Forces.

65. In March 2020, induced by Goldfus's stated intent of pursuing a contract with

11

Conflict Kinetics, Conflict Kinetics sent a Firm Fixed Price proposal to Goldfus for the training system and services for the IDF training at the NAHA base. CK relied on Goldfus' statement that the IDF was in the process "to open a [FMF/FMS] file with the U.S." CK was informed that the FMF/FMS agreement was assigned to an IDF representative, was "in process" and was going to go through, would start in August 2020[1], and that an IDF administrator was assigned to the contract. On April 20, 2020 CK received an email from Ground Forces contracting command stating, "Please confirm that all the NSN's and data in the proposal are good to go and we can move forward." CK provided confirmation that all the numbers and data were correct.

66. Conflict Kinetics provided the requested information to Goldfus in his fiduciary capacity as a member of the Israeli IDF (outside of the PMO) interested in procuring specialized lethality and survivability training services.

67. While holding himself out as a representative of the IDF pursuing a potential contract between CK and the MOD, Goldfus gained access to CK's private training facilities, case studies, data, system demonstrations, methods, processes, engineering drawings, engineering partner information, confidential and proprietary information (collectively "trade secrets") as well as copyright information and patented information of Plaintiff under the auspices of joint military collaboration and procurement for the IDF under the Foreign Military Funding ("FMF") program run by the U.S. Department of State and implemented by the Department of Defense, Defense Security Cooperation Agency.

68. CK's reveal of its trade secrets to Goldfus was specifically because of his relationship with the MOD and exclusively to provide information for the purpose of competing for Israeli Forces contracts.

---

[1] FMS stands for Foreign Military Sales.

69. On March 10, 2021 Goldfus and a contingent representing the MOD again arranged to visit the Conflict Kinetics headquarters in Virginia along with a visit to Camp LeJeune.  For reasons not expressed to Conflict Kinetics, Goldfus changed his plans at the last minute and only appeared at Camp LeJeune during that visit, although the remaining members of his contingent carried through with a visit to the CK headquarters in Virginia to attend presentations related to the products of CK.

70. Conflict Kinetics, as  the Program of Record of Lethality Training for the US Marine Corps, maintained Intellectual property at the Camp Lejeune location where Goldfus was able to exploit that information during his visit.

71. Immediately following this visit to Camp LeJeune, Goldfus stated in a published news article that "the simulations were the highlights of the [IDF's] visit, specifically the Gun Fighter Gym…"  In the same article Goldfus also stated that "[t]he purpose of our visit was to learn about the simulators and leadership courses and how they are integrated into training exercises…."

72. At or about this time, CK learned that Goldfus had stopped the issuance of the S13 contract.  At this time Goldfus was working in his capacity as an agent of the MOD.

73. In the alternative, at the time Goldfus stopped the issuance of the S13 contract, he was working in his individual capacity for his personal interests.

**E.  THE CONSPIRACY TO COMMIT ECONOMIC ESPIONAGE AND MISAPPROPRIATE TRADE SECRETS WITH BAGIRA**

74. In or around February 2020, unbeknownst to CK, Goldfus exceeded his role as liaison with the IDF, and became the lead technical advisor to Bagira providing CK trade secrets to Bagira and directing Bagira on how to use CK trade secrets learned and otherwise purloined by Goldfus, in order to copy and steal the Gunfighter Gym System from CK without worry of

competition, funding or scrutiny.

75. Beginning in February 2020, Goldfus directed to Erez Ben Shaanan, a Bagira employee and Yaron Mizrachi, CEO of Bagira, along with and an IDF officer identified as "LTC Yoav," to collect confidential and proprietary trade secret information from Conflict Kinetics. Goldfus and Bagira systems acted in collaboration to willfully and maliciously injure Plaintiff and its business.

76. Goldfus sent LTC Yoav to CK facilities upwards of ten times to meet and collect dozens of pages of notes from CK representatives all purportedly to support the anticipated contract between CK and the MOD/IDF.

77. Before learning that Goldfus had stopped the S13 contract and before CK knew about Bagira's work in concert with Goldfus and, potentially, the MOD to steal CK intellectual property, Goldfus convinced CK to allow a Bagira employee, Erez Ben Shannan, access to CK facilities and through text and conversation indicated strongly that he trusted Mr. Shannan and wanted him to head up the project for CK.

78. During this time period, Goldfus attempted to send Bagira's CEO Yaron Mizrachi to see the CK facilities in Israel, but the base appropriately denied him entry.

79. In February 2020, after Goldfus coordinated Bagira's efforts to gain access to CK's confidential and trade secret information, CK's Executive Vice President of Business Development Alison Rubin received the first threat from Bagira CEO Yaron Mizrachi stating, "I understand that your President [President of CK] is now in Israel….All the noise you are making now in the industry will not work out in your favor."

80. Later, CEO Yaron Mizrachi stated that "Bagira has learned of CKs contract details" and that "[i]t was brought to Bagira's attention….contract details."  Those details included, but

were not limited to names, dates, contract details, contract status and  other non-public details

that were only available to those inside the Ministry of Defense (MOD). During this time,

Mizrachi stated that "CK getting a contract with IDF in Israel without him is not going to

happen." He further stated he can stop any contract going to CK.  Mizrachi closed his statements

with "So, what can we do together?" These threats were reported to two separate Israeli Generals

and one Israeli Colonel.

81. During a conversation on March 4th, 2020 with a CK representative, Yaron Mizrachi,

CEO of Bagira, discussed how filing a U.S. patent "has pros and cons" because "all the patents

are on the net." Mr. Mizrachi stated that because CK has filed U.S. Patents, he can see the

patents on the training system and methodologies "to the last detail."

82. In the same conversation, Mr. Mizrachi stated, "In the US they give patents very

easy" and "I'm sure they didn't write it here [in Israel] so I can do it, as is, in Israel."

83. Mr. Mizrachi also said, "the patents are nice to have [they are] good for the marketing

only. In the end you are exposed, and everyone knows what you do. And all the weapons

including the inserts. I know about the inserts there. This is the core of CK."

84. During this conversation, Mr. Mizrachi confirmed that Bagira was a year or two away

from producing a similar system and indicated that Bagira was not competing with CK for the

current contract.   Mizrachi did make it clear to CK that CK could not secure MOD contracts

without working with Bagira.

85. In September 2020, during a conversation with an employee of CK and Brian

Stanley, CEO of CK, Bagira CEO Mizrachi stated "I can stop any contract you hope to get in

Israel unless you go through me."  Mr. Stanley reported this event to Colonel Alan Madanes

from the Israeli Embassy in the United States. All these threating statements by Bagira not only

demonstrate that the company has unjust protection from MOD personnel, but more importantly, it establishes that Bagira had no such product at the time of their award, or at the time they obstructed other CK contracts with Israeli special forces units.

86. In May 2021, 60 days after departing Camp Lejeune, Goldfus and Bagira released a commercial that contained CK trade secrets and proprietary information including CK intellectual property, terms, phrases, methods, processes, images, techniques, and designs. Goldfus repeatedly stated in the commercial "This [Bagira] system is one of a kind." Elements of this commercial were being conceptually designed, resourced, budgeted, scripted, staffed, recorded, edited, and finalized for commercial distribution while Goldfus was on the US Marine Corps base. Goldfus was thus providing direct, real-time Lethality and Survivability information from the US to an Israeli vendor. Producing such a video in a 60-day window indicates that Goldfus and Bagira were planning and executing this commercial prior to Goldfus arranging and conducting his trip to Camp Lejeune.

87. This film and the cooperative project between Goldfus and Bagira, indicate that Goldfus had already entered into or committed to a contract with Bagira to provide a training simulator at the time of his last visit to observe the CK intellectual property at Camp LeJeune in March 2021.

88. According to Yaron Mizrachi CEO of Bagira, in 2021 Goldfus began the act of "Leading" Bagira to build the "Ultimate New Training Concept" to resolve Bagira's lack of a competitive product. This product was an unauthorized direct copy of the CK system. Additionally, according to Mizrachi, Bagira "became aware of specific contract details" and then leveraged this unjustly acquired information to target all CK clients and remove CK from all Israeli contracts.

89. By reviewing the Bagira Goldfus commercial and dissecting each section second by second, it is clear that Goldfus canceled the visit to CK headquarters for Camp Lejeune because he and Bagira had already successfully stolen the underlying Lethality Technology. Goldfus now needed to understand how the Marine Corps implements it at the Individual, Squad, Platoon, and Company levels. Before the theft, Goldfus continuously asked CK, "how can the Lethality and Readiness Program be delivered to 120 Soldiers in a single day?" Goldfus needed to spy on the Marine Corps to see exactly how to use his "New Ultimate Training Concept."

90. The public nature of the relationship between Goldfus, an agent of the MOD, and Bagira, demonstrates that Goldfus was acting with the knowledge and support of the MOD in his actions against the interests of CK and for the benefit of the Defendants.

## F.  BREACH OF FIDUCIARY DUTY

91. As noted above, Goldfus enticed Conflict Kinetics to provide more and more confidential and proprietary trade secret information as part of the public tender process in Israel.

92. Conflict Kinetics provided the information and trusted that Goldfus was acting in good faith as a government military officer, representative of the IDF and an agent of the MOD.

93. In May 2021, Bagira publicly posted on LinkedIn that the Bagira released "BIST" as the "new ultimate training concept" and that the training concept was "developed in close cooperation with IDF and was led by BG Goldfus."

94. In May 2021, Goldfus also appeared in a public commercial promoting a Bagira product called "Infantry skills App (BIST)". The Bagira commercial asserts that the system is "the most unique trainer in the world." The BIST system is nearly identical to the CK

simulation and training system which is patented in the U.S. and contains trade secret information created and protected by CK, including but not limited to near identical names of products, graphics on products, floor layout, training paths, objects, rifles, colors, shapes, abstract actions never seen in marksmanship/training systems other than at CK. Neither Bagira nor the IDF had ever conducted any small arms simulation human performance methodological training in the BIST prior to March-May of 2021, nor prior to engaging with CK. There was no iterative process to the Goldfus/Bagira "Ultimate Training Concept." It was created from purloined CK trade secrets.

95. Again, the public nature of the relationship between Goldfus and Bagira supports that Goldfus was acting as an agent of MOD in his interactions with CK against the interests of CK and for the benefit of the Defendants.

96. In a commercial made by Goldfus for Bagira, there are at least 8 violations of CK's trade secrets, patents and trademarks that were presented and demonstrated to Goldfus over the two-year period from 2019 to May of 2021.

97. In a malicious coordinated effort, Goldfus and Yaron Mizrachi, CEO of Bagira communicated with MOD and convinced the MOD to halt award of a CK FMF contract for nine (9) months so Goldfus could assist Bagira with building a CK-like infringing system to replace the CK system. By replacing the U.S. built technology with an Israeli built infringing system, Goldfus and Bagira were able to leverage "Israeli-made" preferences in multiple procurements, thus undermining over 4 years of dedicated contracting process undertaken by contracting personnel within S13.

98. In the normal course of business, Conflict Kinetics provided Goldfus a confidential price proposal in order to receive the IDF contract.

18

99. When Bagira was marketing the copied training systems and methodologies to the Israeli government, they priced their infringing system $10,000 less than the price Conflict Kinetics quoted. CK's proposal and quote were for a custom design and special installation with unique weapon requirement that Bagira could not have found on a public price list.

100. Further, at this time, Bagira did not actually have a working system yet, (therefore was quoting a system that it had not built yet) but remained $10,000.00 under the CK price.[2]

101. Goldfus revealed Plaintiff's confidential pricing to Bagira as another way to ensure that Bagira became the selected vendor of the MOD.

102. Goldfus, working in his capacity as an employee of the MOD, maliciously violated his fiduciary duties to the U.S. Government and Conflict Kinetics by providing confidential and proprietary trade secret information of Plaintiff to Defendant Bagira and then awarding Bagira direct contracts with the IDF on a sole source, non-competitive basis, to build competing training systems and simulations based on CK's confidential and proprietary trade secrets methodologies and process information.

103. In the alternative, if Goldfus was acting independent of the MOD, Goldfus maliciously violated his fiduciary duties to the Israel IDF, the U.S. Government and Conflict Kinetics by providing confidential and proprietary trade secret information of Plaintiff to Defendant Bagira and then awarding Bagira direct contracts with the IDF on a sole source, non-competitive basis, to build competing training systems and simulations based on CK's

---

[2] As evidenced by a March 4th, 2020, email wherein an employee of Bagira, known as "Roy", in a conversation with a CK employee and Yaron Mizrachi, CEO of Bagira stated, "I am not sure there will be a tender, even if it is [a tender], it will take a year or two [before] Bagira can make these things." He then went on to state that because "We [Bagira] are not competing and Goldfus had already did [sic] a presentation on this system, everyone is on board, even the simulation department wants it to go through Bagira. We want to go ahead."

confidential and proprietary trade secret methodologies and process information.

104. These sole source contracts are valued at greater than $10,000,000.00.

## G.  TORTIOUS INTERFERENCE WITH A CONTRACT

105. Subsequent to the Goldfus 2019 visit to CK headquarters, CK was in the  process of securing an FMF contract for training IDF personnel in CK's circuit training approach with a delivery date of August 2020.

106. Goldfus played a part in the program because he was the key decision maker and the penultimate customer.

107. Each time CK met Goldfus and was prepared to deliver the system as contracted, Goldfus would change and/ or increase the scope of the contract. These were deliberate acts in order to hinder CK and draw CK deeper into providing more and more information by claiming the "need of the IDF is growing" and therefore the contract will be bigger, and IDF needed more information.

108. At the same time that he required expedited delivery of the system, Goldfus also required use of a specific rifle (Tevor) for the training.  Because of the purported expedited delivery requirement, Plaintiff was forced to outsource the modifications necessary to the Tevor rifle in order to meet the delivery schedule.

109. Plaintiff partnered with EF, a U.S. vendor, to manufacture the Tevor system based on the prototype requirements that Conflict Kinetics developed for this contract.

110. Plaintiff and CEO, Brian Stanley, personally purchased a Tevor rifle then sent this Tevor rifle to EF to develop on and produce.

111. Goldfus intentionally created short delivery timelines in an effort to remove CK from consideration for the contract.

112. As soon as EF completed the production of the modified Tevor rifles, unbeknownst to CK, Goldfus and Bagira immediately procured EF's entire stock of modified Tevor rifle kits.

113. This procurement of Tevor rifles, directed by Goldfus, interfered with the contract Conflict Kinetics executed with EF for delivery of the modified rifles.

114. This procurement deliberately disrupted CK's ability to perform to the new delivery schedule Goldfus had imposed on CK.

115. Goldfus, acting in an individual capacity or as an agent of the MOD, knowingly and intentionally, disguised his actions as a benefit to the Israeli Defense forces, while in reality the only beneficiary was Bagira, who, working in concert with Goldfus, caused the IDF to impede the contracting process with CK and knowingly and without authorization took multiple trade secrets of Plaintiff through fraud, deception and concealment. This is what was meant by Mr. Mizrachi when he said, "And all the weapons including the inserts. I know about the inserts there. This is the core of CK."  Goldfus was funneling Bagira all the real time information.

116. Goldfus acting in an individual capacity or as an agent of the MOD, without authorization, copied, duplicated, transmitted, delivered, sent, mailed, communicated, and conveyed Plaintiff's trade secrets to Bagira to the detriment of CK.

117. Goldfus, acting in an individual capacity or as an agent of the MOD possessed Plaintiff's trade secrets, appropriated, and obtained Plaintiff's trade secrets and converted them for Bagira's use without authorization.

118. As described *supra*, Goldfus led and conspired with one or more other persons to commit the offense, including the MOD and Bagira Systems.

119. Bagira knowingly and intentionally misled the customer (IDF) that their actions would benefit the Israeli Defense Force while in reality they only are benefiting themselves from

a financial standpoint. Bagira knowingly and without authorization, took multiple trade secrets of Plaintiff through fraud, deception, and concealment.

120. Bagira, without authorization, copied, duplicated, altered, replicated, transmitted, delivered, sent, and communicated Plaintiff's trade secrets to not only the IDF, but multiple other foreign governments through their commercials in which Goldfus was the onscreen star narrator.

121. Bagira, without authorization, received and possessed Plaintiff's trade secrets knowing the same to have been stolen or appropriated, obtained and converted without authorization.

122. Bagira conspired with one or more persons to commit the offense, including Goldfus and the MOD.

### H.  INTERFERENCE WITH  S13 CONTRACT

123. Despite working toward a contract with S13 for several years, CK was advised in April 2021 by the Department of Production and Procurement (DOPP) of the Ministry of Defense (MOD), that the contemplated contract was cancelled without cause.

124. As of March 3, 2022, no system has been provided to S13 that meets their detailed Special Forces Requirement.  MOD cancelled CKs contract without cause and without an alternative that meets the requirement.

125. In the time that has passed since the April 2021 cancellation, S13 commanders have come and gone; however, their requirement and desire for CKs Lethality and Readiness system is very much active.

126. Bagira, who did not previously have a product comparable to the Gunfighter Gym, was providing quotes for such a system to the MOD.

127. On July 27, 2021, an item was published on the Israeli website "News 13" entitled

"A Peek at the IDF's Innovative Simulator."  The item noted that the MOD had purchased "Bagira's training systems" from Bagira, with Brig. Gen. Goldfus appearing in the article and representing that Bagira's training systems was "one of a kind in the world." This was a clear attempt to mislead the IDF, the new Commanders at S13 and the Israeli Taxpayer.

128. Other similar articles published around that time had Goldfus explaining that Bagira had "developed" this system, not "improved" the system.

129. The issue is that the S13 contract was supposed to be for the upgrade and improvement of the legacy IDF simulation system produced by Cubic Corporation. Instead that contract was used to purchase the "new" Bagira System, developed with CK trade secrets.

130. On August 8, 2021, counsel for CK wrote to the MOD and requested all information and documents related to the contract between the MOD and Bagira regarding the procurement of Bagira's training system by the MOD.  CK also requested that the MOD immediately suspend any contract with Bagira relating to the training facility, pending a full clarification of the factual details.  If the contract had already been executed between the parties, the MOD was asked to immediately inform CK.

131. The MOD acknowledged receipt of the letter but provided no information.

132. As the MOD ignored CK's request for information, CK filed an administrative appeal in Israel on August 25, 2021.

133. Concurrent with the appeal, CK also filed a Motion for an Interlocutory Injunction and a Temporary Injunction seeking an instruction to the MOD not to sign any contract or contract extension between the MOD and Bagira pending resolution of CK's administrative appeal.

134. This matter was heard on November 17, 2021 at which time counsel for the MOD

informed that it was willing to provide the documentation related to the exemption from tender related to Bagira along with substantial documentation related to that decision to CK.  Based on that representation, the Court dismissed CK's petition. [3]

135. The administrative matter before the Israeli court in no way concerned the allegations of theft of trade secrets at the heart of this claim.

**COUNT I**
**Violation of Virginia Uniform Trade Secrets Act**
**Va. Code § 59.1-336 *et seq.***
**As to All Defendants**

136. Conflict Kinetics incorporates the allegations of Paragraphs 1 through 135 as if fully restated herein.

137. Conflict Kinetics' confidential and proprietary information, as described above, are trade secrets within the meaning of Va. Code § 59.1-336.

138. At all times relevant to this Complaint, Conflict Kinetics took, and continues to take, not only reasonable, but exhaustive and costly measures to safeguard the confidential and secret nature of its trade secrets, for which independent economic value is derived from not being generally known or readily accessible by unauthorized individuals using proper means, and which trade secrets would be of substantial economic value to its competitors if known to those competitors.

139. By engaging in the actions described herein, Defendants intentionally, willfully, and maliciously acquired, disclosed, and used Conflict Kinetics' trade secrets through improper means, or with knowledge or reason to know whether the trade secrets were acquired by improper means, in violation of Va. Code § 59.1-336 *et seq.*

---

[3] The Motion for Interlocutory Injunction was voluntarily withdrawn by CK upon receipt of information related to Bagira's exemption from tender.

140. Conflict Kinetics has been damaged by Defendants' intentional, willful, and malicious misappropriation of CK's trade secrets, through the unauthorized and wrongful conduct described above, and is therefore entitled to the relief provided by Va. Code §§ 59.1-338 and 338.1, including actual damages in an amount to be proven at trial but in excess of two million dollars ($2,000,000.00), punitive damages of two times Conflict Kinetic' actual damages (limited by statute to $350,000), costs, and reasonable attorneys' fees.

**COUNT II**
**Business Conspiracy**
**Va. Code §§ 18.2-499 and 18.2-500**
**As to All Defendants**

141. Conflict Kinetics incorporates the allegations of Paragraphs 1 through 140 as if fully restated herein.

142. Defendants conspired, procured, directed, participated in, caused, and otherwise engaged in the actions described above.

143. Defendants comprise two or more persons who combined, led, associated, agreed, mutually undertook, or acted in concert together within the meaning of Va. Code § 18.2-499.

144. Defendants acted intentionally, willfully, and maliciously to injure Conflict Kinetics in its reputation, trade, business, or profession in total disregard for the rights of CK.

145. Conflict Kinetics has been damaged by Defendants' unauthorized and wrongful conduct, as described above, and is therefore entitled to the relief provided by Va. Code §§ 18.2-499(A) and 18.2-500, including actual damages in an amount to be proven at trial but in excess of two million dollars ($2,000,000.00), punitive damages of three times CK's actual damages up to the statutory maximum, costs, and reasonable attorneys' fees.

**COUNT III**
**Common Law Conspiracy**
**As to All Defendants**

146. Conflict Kinetics incorporates the allegations of Paragraphs 1 through 145 as if fully restated herein.

147. Defendants conspired, procured, directed, participated in, caused, and otherwise engaged in the actions described in Count II, above.

148. Defendants comprise two or more persons who combined to accomplish the unlawful purposes described above by concerted action.

149. Defendants acted intentionally, willfully, and maliciously to injure Conflict Kinetics in its reputation, trade, business, or profession in total disregard for the rights of CK.

150. Conflict Kinetics has been damaged by Defendants' unauthorized and wrongful conduct, as described above, and is therefore entitled to actual damages in an amount to be proven at trial but in excess of two million dollars ($2,000,000.00) and punitive damages.

**COUNT IV**
**Tortious Interference with a Contract**
**S13 Contract**
**As to All Defendants**

151. Conflict Kinetics incorporates the allegations of Paragraphs 1 through 150 as if fully restated herein.

152. Conflict Kinetics was to be awarded an S13 Sole Source FMF Contract having successfully provided S13 several years of demonstrations, peer training data, U.S. certifications, U.S. accreditations, U.S. verifications, live-fire transfer study data, qualification data, patent information and U.S. and Israeli Sole Source contract justification.

153. Goldfus became aware of the contract and intentionally, unjustly and in furtherance of the conspiracy among the Defendants, demanded postponement of the contract for 9 months

26

while he [Goldfus] could have time to lead Bagira to copy the designs, images, drills, methods, and processes of Conflict Kinetics for the financial gain and interests of Goldfus, Bagira and the MOD.

154. Conflict Kinetics has been damaged by Defendants' intentional and unjust actions to cause interference with contracts of CK as described above, incurring actual damages in an amount to be proven at trial.

**COUNT V**
**Common Law Breach of Fiduciary Duty**
**As to Defendant Goldfus and MOD**

155. Conflict Kinetics incorporates the allegations of Paragraphs 1 through 154 as if fully restated herein.

156. Defendant Goldfus in his capacity as a member of the IDF, an agent of the MOD, and customer of Conflict Kinetics entrusted with the trade secrets of CK, was acting as a fiduciary to CK and owed CK the duties of care, loyalty, and candor on behalf of both himself and the MOD.

157. Defendants Goldfus and the MOD intentionally and willfully breached each of the fiduciary duties owed to Conflict Kinetics in total disregard for the rights and business of CK.

158. Conflict Kinetics has been damaged by Defendants' breach of each of the fiduciary duties as described above and CK is entitled to actual and compensatory damages to be proven at trial, and punitive damages of $350,000.

**COUNT VI**
**Common Law Unjust Enrichment**
**As to All Defendants**

159. Conflict Kinetics incorporates the allegations of Paragraphs 1 through 158 as if fully restated herein.

160. Defendants received substantial financial and reputational benefit at Conflict Kinetics' direct and indirect expense.

161. Through their intentional, willful, unjust, unlawful, and combined efforts as described above, Defendants have received more than $10,000,000.00 in international contracts, including but not limited to the MOD contracts.

162. The surreptitious and unjust methods employed to willfully injure Conflict Kinetics create ample circumstance where it would be unjust for Defendants to retain the benefit received without compensation to CK.

163. Bagira was unjustly enriched by more than $10 million of CK funded research and development information. It is unrealistic to believe a company with no product could gain such wealth in a hazardous industry like firearms lethality training, without any testing, evaluations, or validations of its measures of effectiveness (MOE) and measures of performance (MOP).

164. The potential financial benefit to MOD and Goldfus is undetermined at this time.

## PRAYER FOR RELIEF

WHEREFORE, Conflict Kinetics respectfully requests that this Court enter judgment in its favor and against each of the Defendants and prays that this Court:

1)      Award damages in an amount to be proven at trial but in excess of two million dollars ($2,000,000.00);

2)      Award punitive damages;

3)      Award the costs of this action and reasonable attorneys' fees and expenses;

4)      Award pre-judgment and post-judgment interest;

5)      Grant such other and further relief as the Court should deem just.

6)      Enjoin all Bagira sales within the US and US territories.

7)       Return to CK ownership and possession of any CK code, images, graphics, and related systems currently in possession of any Defendant.

**JURY DEMAND**

Conflict Kinetics hereby demands a trial by jury on all issues for which a trial by jury may be had.

Dated: August 27, 2024                          Respectfully submitted,

Conflict Kinetics Corporation
By Counsel

Milton C. Johns, VSB No. 42305
**Executive Law Partners PLLC**
11130 Fairfax Blvd., Suite 303
Fairfax, VA  22030
T: (571) 500-1010
mjohns@xlppllc.com